**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 21-4367**

UNITED STATES OF AMERICA,

        Plaintiff – Appellee,

   v.

MONTES TERELL MILLER, a/k/a Tripp, a/k/a Montes Terrel Miller,

        Defendant – Appellant.

Appeal from the United States District Court for the Middle District of North Carolina, at Greensboro. Thomas D. Schroeder, Chief District Judge. (1:21-cr-00008-TDS-1)

Argued: May 4, 2023                    Decided: July 21, 2023

Before NIEMEYER, AGEE and RUSHING, Circuit Judges.

Vacated and remanded with instructions by published opinion. Judge Agee wrote the opinion in which Judge Niemeyer and Judge Rushing joined.

**ARGUED:** Sarah Marie Powell, Durham, North Carolina, for Appellant. Margaret McCall Reece, OFFICE OF THE UNITED STATES ATTORNEY, Greensboro, North Carolina, for Appellee. **ON BRIEF:** Sandra J. Hairston, United States Attorney, Eric L. Iverson, Assistant United States Attorney, Lindsey A. Freeman, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Greensboro, North Carolina, for Appellee.

AGEE, Circuit Judge:

Montes Miller appeals his conviction for two counts of being a felon in possession of a firearm or ammunition under 18 U.S.C. § 922(g)(1). He contends that his guilty plea was invalid and that his sentence was procedurally and substantively unreasonable. We conclude that the district court did not plainly err when it accepted Miller's guilty plea. However, we vacate Miller's sentence and remand for resentencing based on the Government's concession that Miller should not have received two criminal history points for being on probation. We reject Miller's other contentions of sentencing error.

I.

A.

In September 2020, Miller—a member of the Nine Trey Gangster Bloods ("NTG-Bloods")[1]—arrived at a gas station and convenience store in Durham, North Carolina. Miller entered the store, and a few minutes later he returned to his vehicle as a silver SUV and another car pulled in front of his vehicle. He went back into the store and "appear[ed] to be on edge" while "repeatedly look[ing] out of the store windows as if looking for something" until the SUV and car drove off. J.A. 13. After making a purchase, Miller left

---

[1] To prove Miller's gang membership, Durham Police Officer and FBI Task Force Officer Timothy Thomas testified that Miller was specifically affiliated with the Bentwood Bloods who frequented the Bentwood Park apartment complex in Durham. He explained that the red bandanna Miller wore at his waist during the September 2020 incident showed his gang affiliation. He also described social media photographs in which Miller used a gang sign and posed with a known gang member, as well as a video posted to Miller's Instagram account in which Miller was holding a pistol.

2

the store and pulled a gun from his pocket. What appears to be the same silver SUV and car again drove by and one of their occupants shot at Miller, causing him to drop to the ground in front of an occupied vehicle. Miller then stood upright as he shot back and advanced toward the vehicles, continuing to shoot as—and well after—they fled the immediate area.[2] Responding officers found shell casings in the parking lot where Miller had been standing.

In November 2020, the Government filed a criminal complaint against Miller, charging him with being a felon in possession of ammunition arising from the September 2020 shooting. Related to the "felon" prong of this crime, Miller had prior state-court convictions for felony speeding to elude arrest and selling/delivering a Schedule II controlled substance. His ten- to twenty-five-month consolidated prison sentence was suspended in favor of twelve months of probation.[3] The plea transcript Miller signed for these state charges listed the maximum sentence for felony speeding to elude arrest as thirty-nine months' imprisonment and for selling/delivering a Schedule II controlled substance as forty-seven months' imprisonment.

Miller was arrested in December 2020 at the Bentwood Park apartments after a short foot chase. When he was arrested, he alerted the arresting officer that he had a firearm in

---

[2] Another man who had been in the vehicle with Miller when he arrived at the store also fired his gun at the fleeing vehicles.

[3] Officer Thomas testified that Miller was on probation for his state charges at the time of the September 2020 shooting, but the Government later conceded that this was an error. Miller's probation ended a few months before the September 2020 incident.

his fanny pack. Miller was thereafter charged by a superseding indictment that added a second count: being a felon in possession of a firearm based on the events at the time of his arrest.

B.

Miller pleaded guilty to the two charges pursuant to a plea agreement. At the plea hearing, Miller stated that he reviewed the superseding indictment with his attorney—which stated that he had been "convicted of a crime punishable by imprisonment for a term exceeding one year, and with knowledge of that conviction," J.A. 102–03—and that he understood it and the charges against him.

Next, the court reviewed the elements of the offenses and stated that to convict Miller of the charges

> the Government would be required to prove beyond a reasonable doubt that you were previously convicted in any court of a crime punishable by imprisonment for a term exceeding one year, in other words, a felony offense, and that on or about September 7, 2020, . . . you knowingly possessed a firearm . . . *and that at the time of the possession you knew of your status as a convicted felon*.

J.A. 132–33 (emphasis added). Miller confirmed that he understood the elements, was admitting to them, and was pleading guilty because he was in fact guilty.

Miller then objected to the Government's factual basis, which contained many of the facts described above. Specifically, Miller objected to the statements that he was a validated gang member; that he appeared on edge when he got to the convenience store prior to the shooting; and that he posted a video of himself holding a gun on his Instagram account. Miller did not object to the factual statement that he had two prior convictions for

4

which he was sentenced to ten to twenty-five months' imprisonment, but which was suspended in favor of twelve months' probation. He also did not disagree that he signed a plea agreement in his state case that listed the maximum terms of imprisonment for his offenses as set out above. His counsel acknowledged that even with his objections, "there is still a factual basis supporting the plea." J.A. 137. The court agreed and accepted Miller's plea.

### C.

Following the entry of Miller's plea, the probation officer filed a Presentence Investigation Report ("PSR") that recommended a base offense level of twenty based on Miller committing the offenses after sustaining a felony conviction for a controlled substance offense (his state offense for selling/delivering a Schedule II controlled substance). The PSR recommended increasing the offense level by four because Miller used a firearm in connection with felony assault with a deadly weapon with intent to kill.[4] The PSR also added two criminal history points based on Miller's commission of the September 2020 offense while on probation for his state crimes, yielding a total criminal

---

[4] At sentencing, the Government acknowledged that it had originally contended that the offense-level calculation should be twenty-seven based on a cross-reference to attempted second-degree murder. The Government withdrew this argument based on a line of cases in which "malice is essentially mitigated when someone is responding to [a heat of passion and sudden quarrel] sort of incident." J.A. 149. The Government explained that it didn't believe the facts supported a finding of malice because Miller was "responding after being shot at." J.A. 152. The court questioned why the facts weren't "second-degree murder facts," J.A. 153, but ultimately acknowledged that the cross-reference had been withdrawn.

5

history score of three and a criminal history category of II. Based on these calculations, Miller's Guidelines range was forty-one to fifty-one months' imprisonment.

At the sentencing hearing, the Government called Officer Thomas as a witness. He testified about Miller's state convictions and described images from Miller's social media—which were admitted into evidence—including the image showing Miller posing at the Bentwood Park apartments with gang members while making a gang hand signal and still images of the video posted to Miller's Instagram account depicting Miller holding a gun. In addition, Officer Thomas described the September 2020 shooting and the circumstances surrounding Miller's arrest. Video footage played in court supported his account of those events.

Miller then objected to the four-level offense-level enhancement based on his possession of a firearm in connection with felony assault. He argued that because there was no identifiable victim and no injury, there could be no assault with a deadly weapon with intent to kill. The Government responded that while injury was required for other felony assaults in North Carolina, it was not required with respect to this particular class of assault. The court overruled Miller's objection. Miller did not otherwise object to the PSR, and the court adopted the PSR, including its findings of fact and conclusion that Miller's Guidelines range was forty-one to fifty-one months' imprisonment.

Considering the 18 U.S.C. § 3553(a) factors, the court varied upward and sentenced Miller to seventy-two months' imprisonment on each count, to run concurrently. Discussing the nature and circumstances of the offense, the court noted first that Miller "must have known that there was trouble brewing because he exit[ed] the convenience

6

store . . . with his firearm already in his left hand," which indicated that he "knew that something was up." J.A. 198. Further, it observed that "[a] reasonable inference from the presentence report is that there was rival gang violence and that [Miller was] aware that [he was] at risk of being shot at." J.A. 199. The court explained that when the shooting started, Miller took cover behind a vehicle with an innocent person in it, thereby recklessly putting that person at risk, and shot back at the shooters while they were leaving, which was "consistent with this being a rival gang fight." J.A. 200. The court concluded that the Government's inference that Miller was retaliating by firing at the fleeing shooters was reasonable and observed that it was "a miracle nobody was hurt." J.A. 199. The court found Miller's offense to be a serious, violent crime because he fired a gun when he didn't need to and it "could have ended extremely badly." J.A. 203–04. Further, the court acknowledged that Miller was on probation during this incident, indicating his "obvious failure to appreciate what [he] need[ed] to do to have lawful conduct and to submit to the authority of the police." J.A. 200. It also pointed out that three months later, Miller was found with another loaded handgun and fled from police (after already having a prior felony for eluding arrest) such that he "obviously did not learn [his] lesson." J.A. 200. Lastly, it mentioned Miller's Instagram posts "glorify[ing] [his] possession of firearms and . . . drug dealing." J.A. 201. From these facts, the court reasoned that Miller's sentence needed to promote respect for the law and protect the public. It also factored in the need to provide deterrence in light of Miller's commission of a crime while on probation and after two prior felony convictions. Lastly, the court noted that it had also considered mitigating factors, including Miller's young age, his intelligence, and his ADHD diagnosis.

7

Miller filed a timely notice of appeal and raises issues with the validity of his guilty plea and the reasonableness of his sentence. We address each argument in turn. This Court has jurisdiction under 28 U.S.C. §§ 1291 and 3742(a).

## II.

First, Miller challenges the validity of his guilty plea under *Rehaif v. United States*, 139 S. Ct. 2191 (2019), and *Greer v. United States*, 141 S. Ct. 2090 (2021). In *Rehaif*, the Supreme Court explained that to obtain a conviction under § 922(g), the Government must establish that the defendant knew he possessed the firearm or ammunition and that, when he possessed it, "he knew he had the relevant status."[5] 139 S. Ct. at 2194. For convictions under § 922(g)(1)—which prohibits anyone "who has been convicted in any court of[] a crime punishable by imprisonment for a term exceeding one year" from possessing a firearm or ammunition—the relevant status is that of a felon. Therefore, as clarified by *Greer*—which addressed how to apply *Rehaif* in the plain-error context, 141 S. Ct. at 2096—"[i]n felon-in-possession cases after *Rehaif*, the Government must prove not only that the defendant knew he possessed a firearm, but also that *he knew he was a felon* when" he did so, *id.* at 2095.

Miller makes three related arguments about the validity of his plea in light of this case law: (1) that the superseding indictment misstated the knowledge-of-status element; (2) that the district court erred by failing to inform him that to establish his guilt, the

---

[5] We refer to this latter requirement as the "knowledge-of-status" element.

Government would have to prove that he knew his prior state convictions carried the possibility of more than a year in prison; and (3) that the district court erred when it determined that there was a sufficient factual basis to support that he knew of his felon status.

Because Miller failed to preserve these challenges by raising them before the district court, we review for plain error.[6] *See* Fed. R. Crim. P. 52(b) ("A plain error that affects substantial rights may be considered even though it was not brought to the court's attention."). Under this standard, (1) "there must be an error"; (2) it "must be plain"; (3) it "must affect substantial rights," "mean[ing] that there must be a reasonable probability that, but for the error, the outcome of the proceeding would have been different"; and (4) it must have "had a serious effect on the fairness, integrity or public reputation of judicial

---

[6] Miller argues that the Court must review his plea challenge for abuse of discretion because he did not have a meaningful opportunity to withdraw his plea based on his lack of experience with the federal criminal justice system, lack of education, young age, and the district judge's warnings about the "serious consequences . . . [that] would result if he tried to withdraw his plea." Opening Br. 36; *see* Fed. R. Crim. P. 51(b) ("If a party does not have an opportunity to object to a ruling or order, the absence of an objection does not later prejudice that party."); *United States v. Bolden*, 964 F.3d 283, 286–87 (4th Cir. 2020) (determining that a criminal defendant did not have a meaningful opportunity to object to a sentencing error, so declining to review issue for plain error). We reject this argument because Miller indicated that he was satisfactorily represented by counsel during his plea hearing; he had significant prior experience with the state criminal justice system; he is "an intelligent person," J.A. 202 (district judge at sentencing hearing); and at least one of the warnings about the consequences of withdrawing a plea that Miller complains the district judge gave him was required before it could accept the guilty plea, *see* Fed. R. Crim. P. 11(b)(1)(A) (requiring the court to inform the defendant of the Government's right to use against him any statement he made under oath). Therefore, Miller has not shown that he could not have moved to withdraw his plea before he was sentenced. *See* Fed. R. Crim. P. 11(d)(2)(B) (permitting a defendant to withdraw a guilty plea after the court's acceptance of the plea but before the court imposes a sentence if "the defendant can show a fair and just reason for requesting the withdrawal").

proceedings." *Greer*, 141 S. Ct. at 2096–97 (cleaned up). The defendant bears the burden of establishing plain error. *Id.* at 2097.

We conclude that Miller has not met his burden of showing that the district court erred by accepting his plea.

### A.

We first address Miller's argument that the superseding indictment erroneously described the knowledge-of-status requirement. Under Federal Rule of Criminal Procedure 7(c)(1), an indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged." It "must contain the elements of the offense charged, fairly inform a defendant of the charge, and enable the defendant to plead double jeopardy as a defense in a future prosecution for the same offense." *United States v. Barringer*, 25 F.4th 239, 246–47 (4th Cir. 2022) (citation omitted).

Miller's superseding indictment provided that he was "convicted of a crime punishable by imprisonment for a term exceeding one year, and with knowledge of that conviction." J.A. 102–03. It therefore properly articulated the knowledge-of-status element, as required by *Rehaif*. His argument that the superseding indictment misstated that element is simply baseless.

### B.

Next, Miller argues that the district court misstated the knowledge-of-status element during his plea hearing. In order to accept a guilty plea, the court must inform the defendant of "the nature of each charge to which the defendant is pleading." Fed. R. Civ. P. 11(b)(1)(G).

10

During the plea colloquy, the district court explained the elements of § 922(g)(1) as follows:

> So let me review with you the elements of both of these offenses, and then I will ask how you intend to plead to them.
>
> Count One, the Government would be required to prove beyond a reasonable doubt that *you were previously convicted in any court of a crime punishable by imprisonment for a term exceeding one year, in other words, a felony offense,* and that on or about September 7, 2020, in Durham County in the Middle District, you knowingly possessed a firearm . . . or ammunition. . . .
>
> . . . .
>
> . . . And so that's what the Government would have to prove is that on or about September 7, 2020, you knowingly possessed ammunition—in that case it would be the cartridge cases—and that the possession was in or affecting commerce, *and that at the time of the possession you knew of your status as a convicted felon.*
>
> And then on Count Two, the Government is required to prove that on or about December 22, 2020, in Durham County, you knowingly possessed a firearm, that is, a Smith & Wesson .38 caliber handgun. The Government would again have to prove that you were previously convicted in any court of a crime punishable by imprisonment for a term exceeding one year; also that the possession was in or affecting commerce; *and that at the time of the possession you knew of your status as a convicted felon.*

J.A. 132–33 (emphases added).

Contrary to Miller's contention, the district court clearly explained that a conviction under § 922(g)(1) required Miller to know that he was previously convicted of a crime punishable by more than a year of imprisonment. While Miller takes issue with the district court's use of the term "felon" as shorthand for an individual convicted of a crime punishable by imprisonment for more than a year, this argument has no merit. The district court explained what this term meant, and the Supreme Court regularly uses the same language to refer to individuals convicted of crimes punishable by more than a year in prison. *See, e.g., Greer*, 141 S. Ct. at 2095 ("In felon-in-possession cases after *Rehaif*, the

11

Government must prove not only that the defendant knew he possessed a firearm, but also that he knew he was a felon when he possessed the firearm." (emphasis omitted)).

Therefore, the district court did not err when it described the elements of § 922(g)(1).

C.

Finally, Miller argues that the district court erred when it determined that there was a sufficient factual basis to support that he knew he had been convicted of a crime punishable by imprisonment for more than a year. Under Federal Rule of Criminal Procedure 11(b)(3), "the court must determine that there is a factual basis for the plea." When determining whether sufficient facts support a plea, the district court does not need to "satisfy itself that a jury would find the defendant guilty, or even that [the] defendant is guilty by a preponderance of the evidence." *United States v. Carr*, 271 F.3d 172, 178 n.6 (4th Cir. 2001). Instead, it need only "assure itself simply that the conduct to which the defendant admits is in fact an offense under the statutory provision under which he is pleading guilty." *Id.* (citation omitted); *see United States v. Mitchell*, 104 F.3d 649, 652 (4th Cir. 1997) (explaining that the district court "need only be subjectively satisfied that there is a sufficient factual basis for a conclusion that the defendant committed all of the elements of the offense").

Here, there was sufficient evidence to support the district court's finding that Miller knew he had been convicted of a crime punishable by more than a year in prison. First, in his state-court proceedings, Miller signed a plea transcript that listed the maximum punishments for his state offenses, both of which were over a year of imprisonment. The signed transcript also listed the sentence Miller received—between ten and twenty-five

months' imprisonment—even though his sentence was suspended in favor of probation.[7]

*See United States v. Reynoso*, 38 F.4th 1083, 1093 (D.C. Cir. 2022) (concluding that the defendant knew the maximum possible sentences for his state convictions were for over a year in prison because he had signed a plea agreement stating his five-year sentence (most of which was ultimately suspended) and the maximum penalties); *United States v. Bryant*, 976 F.3d 165, 176 (2d Cir. 2020) (stating that evidence that the defendant had been informed of the maximum penalties associated with his offense, coupled with his suspended sentence of more than a year in prison, "removes any doubt that [he] was aware of his membership in § 922(g)(1)'s class" (citation omitted)); *United States v. Huntsberry*, 956 F.3d 270, 285 (5th Cir. 2020) (concluding that there was "little possibility that [the defendant] was ignorant of his status as a convicted felon" when he received a suspended

---

[7] Miller asserts that *United States v. Simmons*, 649 F.3d 237 (4th Cir. 2011) (en banc), precludes reliance on the state plea transcript because North Carolina law requires that a criminal defendant be informed of the maximum possible sentence for a crime considering the highest possible criminal history category and aggravating factors and, "[w]ith zero points for prior convictions and the lowest possible prior record level, state law prohibited Miller from receiving anything close to either sentence." Opening Br. 44. This argument is without merit. The issue in *Simmons* was whether the defendant had *actually been convicted* of an offense punishable by more than a year in prison. 649 F.3d at 243. The *Simmons* court answered that question in the negative, reasoning that "as a first-time offender[, the defendant] possessed a prior record level of only 1, and thus could not have received a sentence exceeding eight months' community punishment" under North Carolina's statutory sentencing scheme. *Id.* But here, the issue is Miller's *knowledge of the possibility* of a sentence of more than a year in prison, and the maximum sentences listed in his signed state plea agreement indicate that Miller had that knowledge.

Moreover, even assuming Miller knew he could not receive the maximum sentences, the sentence he received was for ten to twenty-five months' imprisonment, as stated above. Although that sentence was suspended in favor of probation, it is clear evidence from which the district court could have concluded that Miller knew he faced the possibility of more than a year in prison, regardless of *Simmons*.

13

two-year prison sentence and was informed of the maximum sentence); *United States v. Burghardt*, 939 F.3d 397, 404 (1st Cir. 2019) (finding "overwhelming proof establishing" the knowledge-of-status element when the defendant was presumably told the maximum possible sentence when entering his guilty plea).

Second, when questioned at his plea hearing, Miller stated that he reviewed and understood the superseding indictment which, as explained above, properly described the knowledge-of-status element. Moreover, in response to the district court's explanation that the Government would be required to prove that Miller had a prior conviction for a crime punishable by more than a year in prison, Miller stated he understood the elements and was pleading guilty to the offense because he was, in fact, guilty. *See United States v. McCoy*, 895 F.3d 358, 365 (4th Cir. 2018) (explaining that with regard to the sufficiency of the evidence, a defendant is "bound by his sworn statements" at a plea hearing); *United States v. Alston*, No. 19-4070, 2022 WL 313843, at *2 (4th Cir. Feb. 2, 2022) (per curiam) (affirming district court's finding of a sufficient factual basis when the defendant admitted at his plea hearing that he had been convicted of a crime punishable by more than a year of imprisonment).

Finally, it is undisputed that Miller is a convicted felon, and "individuals who are convicted felons ordinarily know that they are convicted felons." *Greer*, 141 S. Ct. at 2095. Further, while Miller argues that factors such as his age, lack of education, and minimal experience with the criminal justice system suggest that he didn't know he was a felon, in light of the above, "[t]here is . . . no reason to believe that [these characteristics] would have prevented him from understanding his status." *Alston*, 2022 WL 313843, at *2.

14

Therefore, we conclude that the district court did not err in determining that there was a sufficient factual basis to support Miller's plea.[8]

III.

Next, Miller challenges the reasonableness of his sentence. The Court reviews this issue for abuse of discretion, considering both procedural and substantive reasonableness. *See United States v. Lymas*, 781 F.3d 106, 111 (4th Cir. 2015). Procedural errors include "improperly calculating[] the Guidelines range,"[9] "failing to consider the § 3553(a) factors," "failing to adequately explain the chosen sentence," and "selecting a sentence based on clearly erroneous facts." *Id.* at 111–12 (citation omitted). "Substantive reasonableness examines the totality of the circumstances to see whether the sentencing court abused its discretion in concluding that the sentence it chose satisfied the standards set forth in § 3553(a)." *United States v. Hargrove*, 701 F.3d 156, 160–61 (4th Cir. 2012) (citation omitted). Only if there is no procedural error will the Court consider substantive reasonableness. *Lymas*, 781 F.3d at 112.

A.

---

[8] Because Miller did not establish that the district court erred, we need not address the other elements of the plain-error standard.

[9] "On a challenge to a district court's application of the Guidelines, we review questions of law de novo and findings of fact for clear error." *United States v. Allen*, 909 F.3d 671, 677 (4th Cir. 2018).

Miller argues his sentence is procedurally unreasonable for four reasons: (1) he should not have received two additional criminal history points because he was not on probation when he committed the September 2020 offense; (2) the four-level enhancement for possession of a firearm in connection with the state offense of assault with a deadly weapon with intent to kill was imposed contrary to the evidence and the law; (3) his prior state conviction does not qualify as a "controlled substance offense" such that his base offense level should not have been set at twenty; and (4) the court relied on erroneous factual findings to support his sentence. The Government concedes the first error and admits that it necessitates remand; thus, we address only the last three purported errors. *See United States ex rel. Drakeford v. Tuomey Healthcare Sys., Inc.*, 675 F.3d 394, 406 (4th Cir. 2012) ("[O]ur precedent is clear that we may address issues that are likely to recur on remand."). We find no additional errors.

1.

The district court increased Miller's base offense level by four levels under U.S.S.G. § 2K2.1(b)(6)(B) for using or possessing a firearm or ammunition "in connection with another felony offense." Miller received this enhancement in connection with the North Carolina offense of assault with a deadly weapon with intent to kill. *See* N.C. Gen. Stat. § 14-32(c).

Miller first asserts that in North Carolina, there cannot be assault under § 14-32(c) without an identified victim. Neither the statute itself nor the sources to which Miller cites mention such a requirement, and we have found none. Therefore, we reject this argument.

16

Second, Miller argues that the district court erred in finding that he had intent to kill.

We disagree.

Under North Carolina law,

[a]n intent to kill is a mental attitude, and ordinarily it must be proved, if proven at all, by circumstantial evidence, that is, by proving facts from which the fact sought to be proven may be reasonably inferred. An intent to kill may be inferred from the nature of the assault, the manner in which it was made, the conduct of the parties, and other relevant circumstances.

*State v. Stewart*, 750 S.E.2d 875, 882 (N.C. Ct. App. 2013) (alteration in original) (citation omitted). Further, "an assailant must be held to intend the natural consequences of his deliberate act." *State v. Grigsby*, 526 S.E.2d 460, 462 (N.C. 2000) (cleaned up). The Supreme Court of North Carolina has specifically concluded that firing a gun into a moving vehicle can fairly lead to the conclusion that the shooter intended to kill the vehicle's occupant. *See State v. Alexander*, 446 S.E.2d 83, 87 (N.C. 1994) ("[W]hen a person fires a twelve-gauge shotgun into a moving vehicle four times while at the same time his accomplice is firing a pistol at the vehicle, it may fairly be inferred that the person intended to kill whoever was inside the vehicle."); *see also State v. Cain*, 338 S.E.2d 898, 905 (N.C. Ct. App. 1986) (holding that intent to kill could be inferred from the defendant's firing of a gun multiple times at the occupant of a vehicle); *State v. Davis*, 506 S.E.2d 455, 475 (N.C. 1998) ("[T]he malice or intent follows the bullet." (citation omitted)).

In this case, Miller fired eleven rounds at occupied vehicles that were driving away while his companion also fired his gun. This suggests an intent to kill because the "natural consequence[]" of firing a gun at people is killing them. *See Grigsby*, 526 S.E.2d at 462 (citation omitted). Also, this situation—repeatedly firing a gun at moving vehicles—is

17

substantively identical to the facts in *Alexander* in which the North Carolina Supreme Court found intent to kill. 446 S.E.2d at 87.[10] Therefore, the district court did not clearly err in concluding that Miller had the intent to kill.

Next, Miller asserts that the district court clearly erred in finding intent because he acted in self-defense. Under North Carolina law, "a person is justified in the use of deadly force and does not have a duty to retreat in any place he or she has the lawful right to be if . . . [h]e or she reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or herself or another." N.C. Gen. Stat. § 14-51.3(a)(1). Here, the district court explained that as Miller was in the course of firing his gun, he did not have a reasonable belief that such force was necessary to protect himself because the shooters were already fleeing. *See* J.A. 199 ("[I]t appears to me that you continued to shoot at the vehicles even though they had continued to drive down the road and were going away."); J.A. 200 ("And so the Government argues that, in some fashion, you were retaliating by continuing to fire against them, and I think that would be a reasonable inference on these facts."); J.A. 203 ("[H]e returned gunfire under a scenario where it is

---

[10] Miller also claims that because the district court only found his actions to be reckless and the Government admitted it could not prove malice, the district court erred in finding he had intent to kill. Again, we disagree. The district court's apparent offhand mention of recklessness at the sentencing hearing does not change our conclusion in so much as the judge specifically overruled Miller's objection to the application of the enhancement. Moreover, the Government's concession that it could not establish malice is not determinative because malice is not a required element of assault with a deadly weapon with intent to kill. *See State v. Tew*, 561 S.E.2d 327, 332 (N.C. Ct. App. 2002) (explaining that malice is an element of first-degree murder but not of assault with a deadly weapon with intent to kill); *see also State v. Garris*, 663 S.E.2d 340, 349 (N.C. Ct. App. 2008) (same).

apparent to me that it was no longer necessary for his protection or anybody else's protection, but seems to have been an effort to persist in what appears to be a gang retaliation or gang war."). That finding is supported by the videos of the shooting and is not clearly erroneous.

In sum, we reject Miller's argument that the district court erred in applying the four-level enhancement for possession of a firearm in connection with assault with a deadly weapon with intent to kill.

2.

Miller also claims that the district court erred in applying a base offense level of twenty under U.S.S.G. § 2K2.1(a)(4)(A) because his prior state conviction was not a "controlled substance offense." To support his argument, Miller points to this Court's recent decision in *United States v. Campbell*, 22 F.4th 438 (4th Cir. 2022). The Court considers *de novo* whether a prior conviction is a "controlled substance offense" under the Guidelines. *Allen*, 909 F.3d at 674. But when—as is the case here—"a defendant fails to preserve his claim" in the district court, "he bears the burden of establishing" plain error for it to be recognized on appeal. *United States v. Bennett*, 698 F.3d 194, 200 (4th Cir. 2012).

a.

This Court first addressed whether a state drug offense qualifies as a controlled substance offense under the Guidelines in *Campbell*. In that case, the Court determined that a defendant's conviction for delivery of crack cocaine under a West Virginia statute that criminalized attempt offenses was not a controlled substance offense under U.S.S.G.

19

§ 4B1.2 such that he was not a career offender subject to an enhanced sentence. 22 F.4th at 440–41. In reaching this conclusion, the Court applied the categorical approach, examining whether the "least culpable conduct" criminalized by the state statute qualified as a controlled substance offense under § 4B1.2. *Id.* at 441 (cleaned up). Under the categorical approach, if the "least culpable conduct" was not a controlled substance offense, then a conviction under the state statute could not support the Guidelines' career offender enhancement. *Id.* (cleaned up). The West Virginia statute at issue in *Campbell* criminalized delivering a controlled substance and defined "deliver" as "'the actual, constructive *or attempted* transfer from one person to another of' controlled substances." *Id.* at 442 (quoting W. Va. Code § 60A-1-101(h)). Therefore, the Court reasoned that "the least culpable conduct criminalized by the West Virginia statute is an attempt to deliver a controlled substance." *Id.* Because the Guidelines' definition of a controlled substance offense did *not* include an attempt to deliver a controlled substance, the Court found no categorical match and held that the defendant could not be subject to the enhanced offense level. *Id.* at 440, 444, 449.

This Court applied *Campbell* in *United States v. Groves*, 65 F.4th 166 (4th Cir. 2023). *Groves* involved a federal statute criminalizing drug distribution that used a similar definition of "delivery" as the state statute at issue in *Campbell*. *See id.* at 172–73 (explaining that the federal statute defined "distribute" as "to deliver" and "deliver" as the "actual, constructive, or attempted transfer of a controlled substance," much like the West Virginia statute discussed in *Campbell* (citations omitted)). In light of this similar statutory language, the *Groves* defendant argued that—like the state statute in *Campbell*—the

20

federal statute criminalized the attempt offense of attempted delivery. *Id.* at 172. And, his argument went, under *Campbell*, *no* attempt offense can constitute a controlled substance offense under § 4B1.2(b). *Id.* at 171. Therefore, he asserted that a conviction under the federal drug distribution statute could not constitute a controlled substance offense for purposes of § 4B1.2(b). *Id.*

The *Groves* Court disagreed with the defendant for two reasons. First, in spite of the similarities between the federal statute and the state statute in *Campbell*, the Court distinguished *Campbell* because the West Virginia statutory scheme at issue there did not criminalize attempt offenses separately from completed drug distribution offenses, whereas federal law separately criminalizes attempt offenses. *Id.* at 173. The Court reasoned that construing the federal statute to include attempt offenses would render the separate federal criminalization of attempt offenses "superfluous." *Id.* at 173–74.[11]

Second, the Court reasoned that finding a conviction under the federal drug statute *not* to be a controlled substance offense under the Guidelines would "absurdly exclude . . . quintessential federal drug trafficking crimes . . . from treatment as a 'controlled substance offense' in Guidelines calculations." *Id.* at 173.

Therefore, unlike in *Campbell*, the Court in *Groves* found that an "attempted transfer" under the federal statute was not the same as an "attempted delivery." *Id.* The

---

[11] Further, the Court noted that in *Campbell*, the Government "did not dispute . . . that the West Virginia drug distribution statute criminalizes the attempt offense of attempted delivery." *Groves*, 65 F.4th at 174 n.5. Therefore, that issue was not before the *Campbell* panel. *Id.*

federal statute thus did not "criminalize[] the attempt offense of attempted delivery," which was the problematic act identified in *Campbell*. *Id.* The result was that a conviction under the federal statute was a controlled substance offense under the Guidelines.

b.

Applying the categorical approach, we consider whether the least culpable conduct criminalized by Miller's prior North Carolina statute of conviction qualifies as a controlled substance offense under the Guidelines. And because this statute is analogous to the one at issue in *Groves*, we apply *Groves'* reasoning to conclude that Miller's state conviction supports a base offense level of twenty under U.S.S.G. § 2K2.1(a)(4)(A).

Miller was convicted under N.C. Gen. Stat. § 90-95(a)(1), which makes it unlawful for a person to "sell or deliver . . . a controlled substance." Similar to the definition at issue in *Groves*, North Carolina defines "deliver" as "the actual[,] constructive, or attempted transfer from one person to another of a controlled substance." N.C. Gen Stat. § 90-87(7).

Also like the federal statutory scheme at issue in *Groves*, North Carolina separately criminalizes attempt offenses from drug offenses. *Compare* N.C. Gen. Stat. § 90-98 ("[A]ny person who attempts or conspires to commit any offense defined in this Article is guilty of an offense that is the same class as the offense which was the object of the attempt or conspiracy . . . ."), *with* 21 U.S.C. § 846 ("Any person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."). Construing § 90-95(a)(1) to include attempt offenses would render that attempt statute superfluous, just as we noted it would have done in *Groves*. *See* 65 F.4th at

22

173; *see also United States v. Davis*, No. 20-4433, --- F.4th ---, 2023 WL 4375035, at *11 (4th Cir. July 7, 2023) (concluding the same with regard to South Carolina law).

What's more, as in *Groves*, construing North Carolina's controlled-substance-delivery statute *not* to be a controlled substance offense under the Guidelines would be "remarkable." 65 F.4th at 172 (quoting *United States v. Booker*, 994 F.3d 591, 596 (6th Cir. 2021)). As explained by the Government, this approach would result in many state controlled-substance-trafficking laws *not* qualifying as controlled substance offenses. This cannot be what the Sentencing Commission intended. *See United States v. Oliver*, 919 F.3d 393, 400 (6th Cir. 2019) (explaining that the Guidelines should not be interpreted so as to "produce a result demonstrably at odds with the intentions of its drafters" (citation omitted)).

For these reasons, as was the case in *Groves*, the statute of conviction is a categorical match with U.S.S.G. § 2K2.1(a)(4)(A), which defines a "controlled substance offense" to include, *inter alia*, a state offense "punishable by imprisonment for a term exceeding one year, that prohibits the manufacture, import, export, distribution, or dispensing of a controlled substance," U.S.S.G. § 4B1.2(b); *see id.* § 2K2.1 cmt. n.1 (indicating that "controlled substance offense" "has the meaning [provided] in § 4B1.2(b) and Application Note 1 of [its] Commentary"). Consequently, the district court did not err in concluding

23

that Miller's prior state conviction was a "controlled substance offense" that warranted a base offense level of twenty under the Guidelines.[12] [13]

3.

Finally, Miller claims that the district court relied on erroneous factual findings in determining his sentence. He questions the court's determination that he was involved in a gang and that he was on edge the night of the shooting such that he was anticipating gang violence. But there was sufficient evidence of Miller's gang membership, including evidence that he associated with gang members; frequented an apartment complex controlled by gang members; posted photos on social media in which he made gang signs; and wore clothing indicating gang affiliation. Further, the video footage from the shooting shows Miller repeatedly glancing toward the parking lot and pulling his gun from his

---

[12] Moreover, even if the district court did err, based on the complexity of this issue and the nuance of the parties' arguments, any such error would not be plain. *See United States v. Ellis*, 326 F.3d 593, 596 (4th Cir. 2003) (explaining that error is only plain if it is "clear" or "obvious" (citation omitted)).

[13] We need not delve into the parties' dispute as to whether the modified categorical approach should apply, which would require us to determine whether Miller was convicted of the North Carolina Class H offense of sale or delivery or the Class G offense of sale. Regardless of whether Miller was convicted of sale or delivery or just sale, the above analysis of "attempted transfer" would apply because the "'sale' of a controlled substance is, like the statutory definition of 'deliver,' an actual, constructive, or attempted transfer of that substance, but one 'for a specified price payable in money.'" *State v. Thorpe*, 390 S.E.2d 311, 313 (N.C. 1990) (quoting *State v. Creason*, 326 S.E.2d 24, 28 (N.C. 1985)); *see also State v. Carr*, 549 S.E.2d 897, 903 (N.C. Ct. App. 2001) ("Having defined the terms 'deliver' and 'delivery' to mean the mere transfer or attempted transfer of a controlled substance, we believe the Legislature intended 'sale' to encompass any such transfer in exchange for consideration.").

pocket before the shooting started. Therefore, the district court also did not clearly err in finding that Miller was on edge because he anticipated gang violence.

### B.

In light of the Government's concession of procedural error, it would be inappropriate to consider Miller's arguments for substantive unreasonableness because "[i]f, and only if, [this Court] find[s] the sentence procedurally reasonable can [it] 'consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard.'" *United States v. Carter*, 564 F.3d 325, 328 (4th Cir. 2009) (citation omitted); *id.* at 330 n.4 ("Having found the sentence procedurally unreasonable, however, we cannot review the sentence for substantive reasonableness.").[14]

### IV.

In conclusion, the district court did not err in accepting Miller's guilty plea, in applying the U.S.S.G. § 2K2.1(b)(6)(B) enhancement at sentencing, in finding that Miller's state conviction supported a base offense level of twenty under U.S.S.G. § 2K2.1(a)(4)(A), or in making certain factual findings at sentencing. However, we must vacate Miller's sentence and remand with instructions to resentence Miller without the two-point criminal

---

[14] Moreover, because the sentencing transcript does not show any indication of bias or inappropriate "unwavering focus" on certain facts, *United States v. Guglielmi*, 929 F.2d 1001, 1005–06 (4th Cir. 1991), we reject Miller's argument that this case should be reassigned to a different district judge.

25

history enhancement based on probationary status, which the Government concedes was erroneous.

*VACATED AND REMANDED*
*WITH INSTRUCTIONS*